**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  09-20015-CIV-UNGARO/SIMONTON**
**(07-20669-CR-UNGARO)**

**CHRISTIAN ANGARITA**
**and LUIS ANGARITA,**

      **Petitioners,**

**v.**

**UNITED STATES OF AMERICA,**

      **Respondent.**

_____/

**REPORT AND RECOMMENDATION**

      **Presently pending before this Court is Christian Angarita's and Luis Angarita's**

**Petition For Writ of Habeas Corpus Pursuant to Title 28 U.S.C. § 2255 (DE # 1).  This**

**matter is referred to the undersigned Magistrate Judge (DE # 5).  The petition is fully**

**briefed (DE ## 7, 13).  For the reasons stated below, the undersigned recommends that**

**the Petition be denied.  Specifically, the undersigned concludes that the claims in this**

**Petition are barred by Petitioners' waivers, contained in their plea agreements, of the**

**right to appeal or collaterally attack their convictions and sentences; and, that even if the**

**waivers were invalid, Petitioners have failed to establish ineffective assistance of**

**counsel because (1) they were not prejudiced by the alleged errors of ineffectiveness**

**since the claimed errors did not affect their decision to plead guilty; and, (2) the**

**performance of their attorney was not objectively unreasonable (1).**

      **I.**      **BACKGROUND**

          **A.**      **The Indictment**

      **On August 23, 2007, a federal grand jury returned a four-count indictment against**

**Petitioners charging them with offenses related to health care fraud.  Specifically, in**

Count One, they were charged with conspiring to defraud the United States by obstructing the administration of the Medicare program; and, to commit offenses against the United States, specifically to file false claims with the Medicare program, in violation of 18 U.S.C. § 287; and, to pay kickbacks to a medical doctor, Zabdy Westerburger, in exchange for fraudulent prescriptions for Medicare beneficiaries, in violation of 42 U.S.C. § 1320a-7b(b)(2); all in violation of 18 U.S.C. § 371.  In Count Two they were charged with conspiring to commit health care fraud, in violation of 18 U.S.C. § 1347, by conspiring to pay kickbacks in order to obtain patient referrals and to submit false claims; all in violation of 18 U.S.C. § 1349.  The indictment also charged each Petitioner with a substantive violation of the anti-kickback statute, in violation of 42 U.S.C. § 1320a-7b(b)(2) and 18 U.S.C. § 2 (Count Three, as to Luis Angarita, and Count Four, as to Christian Angarita) (Case No. 07-20669-CR-UNGARO, DE # 6).[1]

B.      The Angaritas' Plea Agreements

On October 16, 2007, with the assistance of counsel, Petitioner Luis Angarita and Petitioner Christian Angarita each signed a separate plea agreement, which were identical in most respects (DE ## 7-1 (Luis Angarita); 7-2 (Christian Angarita)).  They each agreed to plead guilty to the two conspiracy counts, and the government agreed to dismiss the substantive kickback offense charged against each Petitioner.  They agreed that as to Count One, the maximum term of imprisonment was five years, and as to Count Two, the maximum term of imprisonment was ten years (DE ## 7-1 at ¶ 4 and 7-2 at ¶ 4).  They agreed that the Court had the authority to impose any sentence up to the statutory maximum, and that they could not withdraw their pleas based upon the

---

[1]  Citations to Case No. 07-20669-CR-UNGARO refer to the record in the underlying criminal case.

2

sentence imposed (DE ## 7-1 at ¶ 3; 7-2 at ¶ 3).  The Government reserved the right to inform the court of all facts pertinent to the sentencing process, including all relevant information concerning the offenses committed, whether charged or not (DE # 7-1 at ¶ 6, 7-2 at ¶ 6).  The parties agreed to jointly recommend that the Court impose a sentence within the applicable guideline range, and depart neither upward nor downward (DE ## 7-1 at ¶7, 7-2 at ¶ 7).  The Government agreed to recommend that the applicable guideline range be reduced by either two levels or three levels (if the offense level was 16 or greater) based upon Petitioners' timely acceptance of responsibility (DE # 7-1 at ¶ 8, 7-2 at ¶ 8).  Petitioners agreed to cooperate with the Government, and acknowledged that the Government retained the sole discretion regarding whether to file a motion for downward departure from the sentencing guideline range or a motion for reduction of their sentences based on this cooperation (DE ## 7-1 at ¶¶ 9-10; 7-2 at ¶¶9-10).

Each plea agreement contained a paragraph in which each Petitioner and the Government agreed to jointly recommend that certain findings and conclusions be made by the Court with respect to the calculation of the offense level pursuant to various specified sections of the Sentencing Guidelines.  Specifically, each Petitioner agreed in paragraph 12 of their respective Plea Agreements that the base offense level was level eight, pursuant to Section 2B4.1; that Petitioners would receive a four-level increase as an organizer and leader of criminal activity that involved five or more participants, pursuant to Section 3B1.1(a); and, that Petitioners would receive a two-level increase for an offense involving sophisticated means, pursuant to Section 2B1.1(b)(9) (DE # 7-1 at ¶ 12; DE # 7-2 at ¶ 12).

Each Petitioner also specifically agreed to the amount of the intended loss under Section 2B1.1 of the Sentencing Guidelines resulting from the offense committed in this

case.  Luis Angarita agreed that this amount was $789,657 (DE # 7-1 at ¶ 12).  Christian

Angarita agreed that this amount was $1,377,040 (DE # 7-2 at ¶ 12).

In addition, each agreement contained an express appeal waiver, which stated in

pertinent part, that each of the defendants was aware that he had the right to appeal the

sentence imposed in this case, and that, in exchange for the undertakings made by the

government in the plea agreements, each of the defendants waived "all rights conferred

by Title 18, United States Code Section 3742 to appeal the conviction, any sentence

imposed, including any restitution order, or to appeal the manner in which the sentence

was imposed, or to collaterally attack the conviction, any sentence imposed or the

manner in which the sentence was imposed, including any restitution order, pursuant to

Title 28, United States Code, Sections 2255, 2254, 2241 or any other applicable provision,

unless the sentence exceeds the maximum permitted by statute or is the result of an

upward departure from the guideline range that the court establishes at sentencing."

Each of the defendants stated that he understood that if the government appealed his

sentence, he would be released from the above waiver of appellate rights.  Each of the

defendants acknowledged that he had discussed with his own attorney the appeal

waiver set forth in this agreement, and further agreed, together with the government, to

ask the District Court to enter a specific finding that their waivers of their rights to

appeal the sentences to be imposed in this case were knowing and voluntary (DE # 7-1

at ¶ 15; DE # 7-2 at ¶ 15).

The Plea Agreements specifically state that the sentencing recommendations are

not binding on the Court and that the defendants may not withdraw their pleas based on

the court's decision to not accept a recommendation (DE # 7-1 at ¶ 16; DE # 7-2 at ¶ 16).

C.     The Angaritas' Factual Bases For Their Guilty Pleas[2]

While the Angaritas each agreed to and signed a separate factual basis for their guilty pleas, the factual bases contained significant facts in common (DE # 7-5 (Agreed Factual Basis signed by Luis Angarita); # 7-6 (Agreed Factual Basis signed by Christian Angarita)).  As set forth below, the only difference is that the amount of the loss attributed to Christian Angarita includes, as relevant conduct, money billed to Medicare with respect to his operation of Gemini Medical Services, a company owned and operated by him immediately prior to the establishment with Luis Angarita of Medical 2000, the company through which the scheme alleged in the Indictment was perpetrated; whereas the loss attributed to Luis Angarita includes only the money billed to Medicare with respect to the operation of Medical 2000.

1.     The Facts Common To Each of the Factual Bases

The common portion of the factual bases stated that, beginning in approximately December 2000, and continuing through February 2004, Luis Angarita and his brother, Christian Angarita, conspired together, and with Dr. Zabdy Westerburger, a licensed physician, and with others to defraud the United States, to cause the submission of false claims to the United States, and to offer and pay health care kickbacks, all in violation of 18 U.S.C. § 371.  In addition, the Angaritas conspired with each other and with Dr. Westerburger and others to commit health care fraud, in violation of 18 U.S.C. § 1349.

The Angaritas owned and operated a durable medical equipment ("DME") company named Medical 2000 Co., ("Medical 2000"), located in Hialeah, Florida.  The

_____

[2]  At the plea colloquy, the Angaritas each stated that they had each read and reviewed with their attorneys their individual factual basis, and each stipulated that those facts contained therein were true and correct.

Angaritas established relationships with Medicare beneficiaries for the purpose of obtaining their Medicare cards and personal information in order to submit false claims seeking reimbursement for medically unnecessary respiratory equipment, including oxygen concentrators and aerosol medications.  These aerosol medications could be billed to the Medicare program only if a physician prescribed aerosol medication that required "compounding."  The process of "compounding" medication involves the making of an aerosol medication by a pharmacist for a quantity that is not commercially available.  The Angaritas entered into an arrangement with Dr. Westerburger whereby she agreed to sign prescriptions for the defendants' beneficiaries, in return for kickback payments.  The Angaritas would deliver the medical equipment that was listed on the prescriptions signed by Dr. Westerburger to the beneficiaries, and then submit fraudulent Medicare claims through Medical 2000 seeking reimbursement for the cost of such equipment.  Because the Angaritas, through Medical 2000, could not submit claims to Medicare directly for aerosol prescriptions, they would send the prescriptions that called for "compounded" aerosol medications to certain pharmacies, thereby causing those pharmacies to submit false and fraudulent claims to the Medicare program. Although the beneficiaries were provided the "compounded" medications, the beneficiaries did not use or need the medications or the DME.  In fact, these "compounded" medications and medical equipment, allegedly provided by Medical 2000, were not medically necessary or reasonable for the beneficiaries.

2.    Facts Solely as To Luis Angarita

Luis Angarita agreed that the intended loss from the Medical 2000 scheme was seven hundred eighty-nine thousand six hundred and fifty-seven dollars ($789,657). Furthermore, Luis Angarita also agreed that he was a leader/organizer of the Medical

6

2000 scheme, that involved five or more participants and was otherwise extensive, because he recruited (35) beneficiaries and a doctor; and, accordingly, he should receive a four point role enhancement pursuant to Section 3B1.1(a) of the Sentencing Guidelines.  Additionally, Luis Angarita agreed that the offense otherwise involved a sophisticated means, that being the formation of Medical 2000 in order to facilitate Medicare fraud, and accordingly, he should receive a two point role enhancement pursuant to Section 2B1.1(b)(9) of the Sentencing Guidelines.

As alleged in the Indictment, Luis Angarita further agreed that Medical 2000 caused Medicare to actually pay five hundred seventy-four thousand two hundred and fifty-six dollars ($574,256) "as a result of false claims submitted to Medicare for medically unnecessary equipment and prescriptions for 'compounded' aerosol medication" (DE # 7-5 at 3-4).

3.    Facts Solely as To Christian Angarita

Beginning in approximately August 1999, and continuing through November 2000, Christian Angarita also owned and operated another DME company known as Gemini Medical Services ("Gemini"), located in Miami, Florida.  Through Gemini, Christian Angarita established relationships with Medicare beneficiaries for the purpose of obtaining their Medicare cards and personal information in order to submit false claims seeking reimbursement for medically unnecessary respiratory equipment, including oxygen concentrators and aerosol medications.  Also through Gemini, Christian Angarita entered into an arrangement with Dr. Westerburger whereby she agreed to sign prescriptions for Christian Angarita's beneficiaries, in return for kickback payments.  Christian Angarita would deliver the medical equipment that was listed on the prescriptions signed by Dr. Westerburger to the beneficiaries and then submit

fraudulent Medicare claims through Gemini seeking reimbursement for the cost of such equipment.  Because Christian Angarita, through Gemini, could not submit claims to Medicare directly for aerosol prescriptions, Christian Angarita would send the prescriptions that called for "compounded" aerosol medications to certain pharmacies, thereby causing those pharmacies to submit false and fraudulent claims to the Medicare program.  In fact, these "compounded" medications and associated medical equipment, allegedly provided by Gemini, were not medically necessary or reasonable for the beneficiaries.

As alleged in the Indictment and by way of relevant conduct, Christian Angarita agreed that the intended loss from the Medical 2000 scheme and the Gemini Medical Services scheme combined, was one million three hundred seventy-seven thousand and forty dollars ($1,377,040).  Furthermore, Christian Angarita agreed that he was a leader/organizer of the Medical 2000 scheme that involved five or more participants and was otherwise extensive, because he recruited at least (35) beneficiaries and a doctor; and, accordingly, he should receive a four point role enhancement pursuant to Section 3B1.1(a) of the Sentencing Guidelines.  Additionally, Christian Angarita agreed that the offense otherwise involved a sophisticated means, that being the formation of Medical 2000 in order to facilitate Medicare fraud; and, accordingly, he should receive a two point role enhancement pursuant to Section 2B1.1(b)(9) of the Sentencing Guidelines.

As alleged in the indictment and by way of relevant conduct, Christian Angarita further agreed that both the Medical 2000 scheme and Gemini Medical Services scheme caused Medicare to actually pay one million sixteen thousand nine hundred and eighty-nine dollars ($1,016,989) "as a result of false claims submitted to Medicare for medically unnecessary equipment and prescriptions for 'compounded' aerosol medication" (DE #

8

7-6 at 3-4).

        D.      **Petitioners' Plea Colloquy**

On October 16, 2007, Petitioners each pleaded guilty to Counts 1 and 2 of the Indictment, pursuant to their signed Plea Agreements (DE # 7-4).[3]  At the guilty plea colloquy, in response to the District Court's question as to whether Petitioners were there to plead to the indictment, Petitioners' counsel stated that he had consulted with Petitioners on this issue, and that Petitioners were prepared to sign the plea agreements as drafted by the Government (DE # 7-4 at 3).  It was noted that the plea agreements and the factual bases were different for each Petitioner (DE # 7-4 at 4).  Petitioners then signed their factual bases (DE # 7-4 at 4-5).  The Court asked Petitioners' counsel if he had been over the factual bases with each Petitioner.  Petitioners' counsel replied that he had (DE # 7-4 at 5).

The District Court then conducted the plea colloquy (DE # 7-4 at 5-20).  During the colloquy, Petitioners both stated that they had had a full opportunity to discuss with their counsel the charges, their defenses and the plea agreements, that they were satisfied with the counsel, representation and advice they had received from their counsel, and that they each understood every term of their plea agreements (DE # 7-4 at 7-8).  The Court then established that the only difference between the two agreements was the loss amount and restitution amount, and advised Petitioners that she was going to first review the plea agreement with Luis Angarita, and then review with Christian Angarita the difference between the plea agreements.  Following this statement, the Court reviewed the plea agreement with Luis Angarita (DE # 7-4 at 8-13).  In reviewing the

---

   [3]  The transcript of the plea colloquy can also be found at DE # 54, Case No. 07-20669-CR-UNGARO.

terms of the plea agreement, the Court expressly discussed the waiver of the right to appeal or collaterally attack the sentence imposed by the Court.  Specifically, the District Judge advised the Petitioners:

> The agreement also contains a partial waiver of your appeal rights. Under the agreement you are giving up your right to appeal the sentence imposed in this case, including any restitution order, or the manner in which the sentence was imposed, and you've also given up the right to collaterally attack your sentence under any of the federal statutes or constitutional provisions which would allow you to do so, unless the sentence exceeds the maximum permitted by statute or is the result of an upward departure from the guideline range established at the time of sentencing.
>
> However, if the U.S. Attorney's office appeals your sentence, then you are released from your waiver of your appellate rights.
>
> Also, by signing the agreement, you've acknowledged that you've discussed the appeal waiver with your lawyer and you've agreed to waive your appeal rights, except as set forth in the agreement, and you've also agreed to entry of a specific finding that your waiver of your right to appeal was knowing and voluntary.

(DE # 7-4 at 12-13).  The Court then asked Luis Angarita if there was anything about the plea agreement that he did not understand, and Luis Angarita said no (DE # 7-4 at 13). The District Court then informed Christian Angarita of the differences between his plea agreement and Luis' plea agreement, and asked if there was anything about the plea agreement that Christian did not understand, and Christian said no (DE # 7-4 at 13-14).

The Court then continued with the colloquy as to both Petitioners (DE # 7-4 at 13-19).  Each Petitioner stated that he and his counsel had spoken about the application of the Sentencing Guidelines (DE # 7-4 at 15-16).  Both Petitioners stated that they understood that the Court would not be able to determine the guideline sentence until after the receipt of the presentence report, that both Petitioners and the government would have the opportunity to challenge the facts and conclusions contained in the

presence report, and that the ultimate sentence might be more or less than they expect or have been told to expect, or more or less than the guideline range, and if the sentence was more than their expectation, that fact would not allow them to withdraw their guilty pleas (DE # 7-4 at 16-17).  The Court also informed each Petitioner that the only appeal rights that they would have with respect to their sentences were those specifically set forth in their plea agreements, and Petitioners each stated that they understood (DE # 7-4 at 17).  Petitioners also stated that they each had an opportunity to review the agreed factual basis for the plea and to discuss it with counsel, and they each agreed with their factual basis (DE # 7-4 at 19).  The Court then accepted Petitioners' guilty pleas to Counts 1 and 2, finding that each Petitioner was:  fully competent and capable of entering an informed plea; aware of the nature of the charges and the consequences of his plea; that the guilty plea was knowing and voluntary; and, that it was supported by an independent factual basis that contained each of the essential elements of the offense (DE # 7-4 at 19-20).

**E.    The Sentencing Hearing**

On December 20, 2007, the District Court sentenced Petitioner Christian Angarita to concurrent terms of 57 months of imprisonment, followed by three years of supervised release, and sentenced Petitioner Christian Angarita to concurrent terms of 51 months of imprisonment, followed by three years of supervised release (Case No. 07-20669-CR-UNGARO, DE ## 47-50, 55).  The Presentence Investigation Reports ("PSI") prepared by the Probation Office contained the same facts that were set forth in the Agreed Factual Basis, and computed the sentence in accordance with the recommendations made in the Plea Agreement.  At the sentencing, Petitioners' counsel stated, in response to the Court's questioning, that Petitioners had no objection to the

11

PSI (DE # 7-3 at 3).  Government counsel recommended the low end of the guideline range for each Petitioner; 57 months for Christian Angarita and 51 months for Luis Angarita (DE # 7-3 at 4).  Petitioners' counsel called five witnesses to testify at the sentencing hearing – Gabriel Guijarro, David Dalmau, Carla Ricardo (Christian's fiancee), Norma Alvarez (Luis' girlfriend), and Petitioners' mother (DE # 7-3 at 4-9).  Petitioner Christian Angarita also spoke, both for himself and for his brother Luis (DE # 7-3 at 10-11).  Finally, Petitioners' counsel spoke (DE # 7-3 at 11-12).

The Court sentenced Petitioner Christian Angarita to concurrent terms of 57 months of imprisonment, followed by three years of supervised release, to pay restitution in the amount of $1,016,989, and a $200 assessment (DE # 7-3 at 14-17; Case No. 07-20669-CR-UNGARO, DE ## 48, 50, 55).  The Court then asked if Petitioner Christian Angarita or his counsel objected to the Court's findings of fact or to the manner in which sentence was pronounced, to which Petitioners' counsel answered "We do not".  The Court then dismissed Count 4 (DE # 7-3 at 17).

The Court then sentenced Petitioner Luis Angarita to concurrent terms of 51 months of imprisonment, followed by three years of supervised release, to pay joint and several restitution with Christian Angarita in the amount of $574,256, and a $200 assessment (DE # 7-3 at 19-21; Case No. 07-20669-CR-UNGARO, DE ## 47, 49, 55).  The Court also ordered forfeiture of Luis Angarita's interest in certain property, consistent with the plea agreement (DE # 7-3 at 21-22).  The Court then asked if Petitioner Luis Angarita or his counsel objected to the Court's findings of fact or to the manner in which sentence was pronounced, to which Petitioners' counsel answered "We do not".  The Court then dismissed Count 3 (DE # 7-3 at 22-23).

This motion followed.

12

II.     **THE POSITIONS OF THE PARTIES**

    A.     **The Angaritas' Position**

 Petitioners contend that their convictions and sentences should be vacated because their trial counsel, William Pearson, Esq. (hereafter Pearson), was ineffective in the following respects:

> a)      Trial counsel's failure to review discovery, and in particular the billings to and payments by Medicare, precluded him from learning facts pertinent for plea bargaining purposes and sentence guideline calculations that would have lessened Petitioners' sentences;
>
> b)      Trial counsel's (mis)advice to Petitioners to accept various terms of the plea agreements the government offered them even though these terms were unsupported by the facts and contrary to the law and led to the imposition of sentences that were higher than they should have been; and
>
> c)      Trial counsel's failure to seek enforcement of a grant of immunity, under which Christian provided the government evidence about crimes other than those for which he was indicted, coupled with his advice Christian stipulate (in his plea agreement) to the adverse use of this information, resulted in a higher sentence for Christian than he should have received.

 (DE # 1 at 3).

Relying on *Glover v. United States*, 532 U.S. 198 (2001), Petitioners contend that they were prejudiced by these claims of ineffectiveness since the result was the computation of a higher advisory Sentencing Guidelines range.

    B.     **The Government's Position**

The Government responds that the claims are barred because in their plea agreements Petitioners knowingly and voluntarily waived their rights to collaterally attack their convictions and sentences, and the record establishes that their pleas and waivers were knowing and voluntary; that counsel's conduct did not amount to

ineffectiveness since the challenged interpretations of the sentencing guidelines regarding the computation of the amount of loss and role enhancement were, as a matter of law, correct and supported by the factual basis to which each Petitioner agreed; and, that the activities of Christian Angarita at Gemini were properly considered as relevant conduct for purposes of determining the loss amount, and the use of this information was not barred by the limited immunity agreement.  The Government emphasizes that Petitioners have not disputed their guilt, called into question the validity of the plea agreements, suggested that the conviction is invalid, or argued that they would not have entered guilty pleas had counsel acted in what they view as an effective manner.  The Government contends that Petitioners' argument that they could have received a better deal with effective counsel is insufficient to render the plea or waiver invalid.  In sum, the Government argues that the Petition should be denied without an evidentiary hearing because the record in the case conclusively establishes that Petitioners are not entitled to relief (DE # 7 at 2, 7-12).

### C.  Petitioners' Reply

In response to the government's argument that the Petition is barred by Petitioners' plea agreements, Petitioners assert that the government mischaracterizes Petitioners' claims, and that these claims are not barred by the waiver provisions in the plea agreements (DE # 13 at 1-4).  Specifically, although Petitioners do not challenge the Government's assertion that the claims of ineffectiveness did not affect their decision to enter a plea of guilty; they argue that they would not have entered into these particular plea agreements that contain the challenged stipulations if they had received effective assistance of counsel.  Relying on *United States v. Cockerham*, 237 F.3d 1179, 1184 (10th Cir. 2001), they argue that their waiver of collateral review does not bar these claims

since the claims are based upon ineffective assistance of counsel in connection with the negotiation of the agreement, and that appeal waivers are not enforceable with respect to such claims.  On the merits, Petitioners challenge the Government's contention that the guideline computations were correct; and with respect to Christian Angarita, also contend that the immunity provision contained in Section 1B1.8 of the Sentencing Guidelines, as well as the immunity letter, precludes the Government from using fraudulent activities of Gemini as relevant conduct.

### III.  ANALYSIS

#### A.  Petitioners Have Waived Their Right To Bring This Petition

##### 1.  *Waivers Are Generally Enforceable*

In *Williams v. United States*, 396 F.3d 1340 (11th Cir. 2005), the Eleventh Circuit expressly recognized the validity of a defendant's waiver of the right to collaterally attack his sentence in the context of a § 2255 petition.  In reaching this result, the Court first noted that in *United States v. Bushert*, 997 F.2d 1343, 1350-51 (11th Cir. 1993), it had previously upheld the validity of sentence-appeal waivers as long as the district court specifically questioned the defendant concerning the sentence appeal waiver during the plea colloquy, or it was manifestly clear from the record that the defendant otherwise understood the significance of the waiver.  The Court then determined that the same rule applied with respect to waivers of the right to collaterally attack a sentence through a claim of ineffective assistance of counsel during sentencing.  In reaching this result, the Court reasoned that to hold otherwise "would permit a defendant to circumvent the terms of the sentence-appeal waiver simply by recasting a challenge to this sentence as a claim of ineffective assistance, thus rendering the waiver meaningless."  *Id.*  at 1342. The Court noted, however, that Williams had not challenged the validity of the plea or

waiver based on ineffective assistance of counsel, and that such claims might survive a collateral attack waiver.  396 F.3d at 1342 n.2, *citing United States v. Pruitt*, 32 F.3d 431, 433 (9th Cir. 1994) (holding that waiver was enforceable because defendant's claim of ineffectiveness did not relate to the plea or plea agreement, but only to the mishandling of the sentencing); *United States v. White*, 307 F.3d 336, 341-44 (5th Cir. 2002) (holding that an ineffective assistance of counsel claim survives a waiver only where the claimed ineffective assistance directly affected the validity of the waiver or the plea itself); *United States v. Cockerham*, 237 F.3d 1179, 1191 (10th Cir. 2001) (ineffective assistance of counsel claim survives only to the extent that it challenges the validity of the plea or waiver).  Since the district court in *Williams* had specifically questioned the defendant regarding the appeal/collateral attack waiver, and determined that he had entered into the written plea agreement knowingly and voluntarily, he was precluded from challenging his sentence.  *Accord United States v. Djelevic*, 161 F.3d 104, 107 (2d Cir. 1998) (although "dress[ed] up" as a Sixth Amendment claim, defendant really is challenging the correctness of his sentence under the guidelines and, therefore, is barred by the plain language of his plea agreement; to allow his claim would be to "render[ ] meaningless" such plea agreement waivers); *Carver v. United States*, 349 Fed. Appx. (10th Cir. 2009) (appellate court denied a certificate of appealability to a § 2255 movant who had waived her right to make a collateral attack on her sentence, finding that she could not overcome her waiver and raise ineffective assistance of counsel at sentencing because: 1) she could not show that she would not have entered her plea had her attorney accurately estimated her sentence and 2) she acknowledged in the plea agreement and during the plea colloquy that her attorney's estimate of her sentence was not binding and that her sentence was a matter solely within the control of the

16

sentencing judge), *cert. denied*, 130 S.Ct. 1316 (2010).

A review of the relevant caselaw leads the undersigned to conclude that in determining the enforceability of a waiver, the Court must consider three factors: (1) whether the claim asserted falls within the scope of the waiver; (2) whether the waiver was made knowingly and voluntarily; and (3) whether enforcing the waiver would result in a miscarriage of justice. *See Arnoldini v. United States*, 2009 WL 1110313, Case No. 2:08-CV-305 TS (D. Utah Apr. 23, 2009) (discussing the three factors).

The first element is obvious. If the waiver does not cover the scope of the challenge, it cannot bar that particular challenge. For example, in an unpublished opinion, the Eleventh Circuit held that where a waiver provided only that a defendant waived the right to collaterally attack only her <u>sentence</u>, it did not bar consideration of her claims that her counsel was ineffective in plea negotiations. *United States v. Cowart*, 139 Fed. Appx. 206 (11th Cir. 2005).

With respect to the second element, in order to establish that the defendant knowingly and voluntarily waived his right to appeal or collaterally attack his sentence, the record must establish either that the Court specifically questioned the defendant concerning the waiver during the Fed.R.Crim.P. 11 colloquy, or, that it is manifestly clear from the record that the defendant otherwise understood the full significance of the waiver, and that he knowingly and voluntarily agreed to waive that right. *Williams,* 396 F.3d at 1342; *Bushert,* 997 F.2d at 1351.

The third element–miscarriage of justice–appears to be the basis upon which the Courts have held that a waiver will not be enforced with respect to certain challenges based upon ineffective assistance of counsel in connection with the decision to enter a plea of guilty and/or waive the right to appeal or collaterally attack the conviction and

17

sentence.  Although the Eleventh Circuit expressly reserved its decision on this issue in *Williams*, the Court subsequently addressed it, in an unpublished opinion, in *Patel v. United States*, 252 Fed. Appx. 970 (11th Cir. 2007).  There, the Eleventh Circuit held that a valid appeal/collateral attack waiver would not be enforced when the claim of ineffective assistance challenged the validity of the defendant's guilty plea.  In *Patel*, the defendant claimed that his counsel was ineffective for coercing him to plead guilty, and specifically that his guilty plea and appeal waiver were involuntary as a result of misleading advice he received from his counsel.  To support this claim, the defendant alleged that his counsel told him that if he pled guilty he would receive a sentence of two to three years in prison, and would be returned to India within six months, but that if he went to trial and was convicted he would receive a much longer sentence.  In fact, the defendant was sentenced to serve 135 months in prison.  The Court first determined that since the defendant had directly challenged the voluntariness of his guilty plea, it was not barred by the appeal waiver.  The Court then determined, on the merits, that the record conclusively refuted the defendant's claim of ineffective assistance based upon the statements he made under oath at the plea colloquy.

In determining that the waiver did not bar his ineffective assistance of counsel claim, the Eleventh Circuit in *Patel* relied upon the rationale expressed by the Eighth Circuit Court of Appeals in *DeRoo v. United States*, 223 F.3d 919, 924 (8th Cir. 2000), which it quoted:

> A decision to enter into a plea agreement cannot be knowing and voluntary when the plea agreement itself is the result of advice outside the range of competence demanded of attorneys in criminal cases.  Therefore, justice dictates that a claim of ineffective assistance of counsel in connection with the negotiation of a cooperation agreement cannot be barred by the agreement itself–the very product of the alleged

18

ineffectiveness.

In addition, to support this result the Court again cited *United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001).  In *Cockerham*, the Tenth Circuit examined the validity of a collateral attack waiver, and held that some of the claims asserted by the defendant were barred by the waiver, while others were not.  The Court first determined that a waiver of 2255 rights was generally enforceable where the waiver was expressly stated in the plea agreement and where both the plea and the waiver were knowingly and voluntarily made.  The Court then turned to the question of whether such a waiver was enforceable with respect to claims of ineffective assistance of counsel.  In this regard, the Court cited with approval the decision of the Seventh Circuit Court of Appeals, in *Jones v. United States*, 167 F.3d 1142, 1145 (7th Cir. 1999).  In *Jones*, the court held that "the right to mount a collateral attack pursuant to 2255 survives [a waiver] only with respect to those discrete claims which relate directly to the negotiation of the waiver," a point which the government conceded on appeal.  In reaching this result the court in *Jones* relied upon the rationale that where the claim of ineffectiveness *caused* the waiver, the waiver cannot bar the claim.  Based upon this rationale, the *Cockerham* court then stated that there were two critical components to determine whether the right to collateral relief survived the waiver.  The first was whether there was any basis for a claim of ineffective assistance of counsel, and the second was whether the ineffectiveness claim pertained to the validity of the plea.  Claims pertaining to the validity of the plea or waiver were not waived; those which fell outside that category were waived.

Thus, although the Eleventh Circuit has not addressed this issue in a published opinion, the undersigned concludes that a waiver of the right to challenge a conviction

and sentence will be enforceable unless a defendant claims that the alleged ineffective assistance of counsel caused the defendant to either enter a plea of guilty or waive the right to review.  Under either of these scenarios, it would be a miscarriage of justice to enforce the otherwise valid waiver.

2. *The Waivers in the Case At Bar Are Enforceable and Bar the Claims Asserted by Petitioners*

a. <u>The Claims Fall Within the Scope of the Waiver</u>

The waiver in the case at bar is broadly written, applies to all challenges to the convictions and sentences, and expressly includes collateral attacks pursuant to 28 U.S.C. § 2255.  Thus, it clearly covers the claims alleged in the case at bar, and Petitioners have not contended otherwise.

b. <u>The Waivers Were Knowingly and Voluntarily Made</u>

In the case at bar, the District Judge expressly reviewed the terms of the waivers with both Petitioners.  During the plea colloquy, as quoted above, the Court explained the sentence appeal waiver in detail to the Petitioners, and reviewed the statement in the written plea agreement in which Petitioners acknowledged that they had discussed the waiver with their lawyer, and agreed to a determination by the Court that the waiver was knowing and voluntary (DE # 7-4 at 11-13).  Petitioners both stated that they had been given a full opportunity to discuss with their counsel the charges, their defenses and the plea agreements, and that they were fully satisfied with counsel and understood each term of their plea agreement (DE # 7-4 at 6-7). The Court asked each Petitioner separately if there anything about the plea agreement that they did not understand, and they each said no (DE # 7-4 at 12-14, 17).  The Court expressly confirmed again, later in the plea colloquy, that each Petitioner understood that the only appeal rights they would have

were those that were set forth specifically in the plea agreement (DE #7-4 at 16).  Thus, it is clear that the Court reviewed the pertinent issues in great detail during the plea colloquy.  Based upon the plea colloquy and the written plea agreements, the undersigned concludes that the record conclusively establishes that Petitioners fully understood the waivers and intentionally relinquished their rights to appeal and collaterally attack their convictions and sentences.  Petitioners have not contended otherwise; the crux of their challenge goes to the advice of counsel regarding sentencing computations and not to the decision to waive their rights to appeal and collaterally attack their convictions and sentences.  Therefore, the undersigned concludes that the waivers were knowingly and voluntarily made.

> c.   **Enforcement of the Waiver Does Not Result in a Miscarriage of Justice**

It is the third element–miscarriage of justice–which lies at the heart of Petitioners' claim that the waiver of the right to collateral attack should not bar their claims.  This is a much closer question than the first two elements; however, for the reasons stated below, the undersigned concludes that enforcement of the waiver under the circumstances alleged in the case at bar would not result in a miscarriage of justice, and therefore the waiver is enforceable.

As previously stated, a defendant's waiver of the right to appeal "directly or collaterally" encompasses his right to challenge his sentence in a section 2255 proceeding.  *See Williams,* 396 F.3d at 1342; *accord United States v. White,* 307 F.3d 336, 341-44 (5th Cir. 2002); *Garcia-Santos v. United States,* 273 F.3d 506, 508-09 (2d Cir. 2001); *Davila v. United States,* 258 F.3d 448, 451-52 (6th Cir. 2001); *United States v. Cockerham,* 237 F.3d 1179, 1183-87 (10th Cir. 2001); *Mason v. United States,* 211 F.3d 1065, 1069-70

(7th Cir. 2000). The waiver is enforceable against claims of ineffective assistance of counsel at sentencing, because "a contrary result would permit a defendant to circumvent the terms of the sentence-appeal waiver simply by recasting a challenge to his sentence as a claim of ineffective assistance, thus rendering the waiver meaningless. *Williams,* 396 F.3d at 1342; *see also Cockerham,* 237 F.3d at 1182 (appeal and collateral attack waiver provision in plea agreement waives the right to section 2255 petition based on ineffective assistance of counsel unless the challenge concerns the validity of the plea or waiver); *Mason,* 211 F.3d at 1069 (same).  In particular, if the complaint underlying the ineffective assistance claim was waived by a defendant's plea agreement, then the ineffective assistance claim also was waived.  *See Williams,* 396 F.3d at 1342 (acknowledging that exceptions in plea agreement to defendant's waiver of appeal did not apply to the claims raised in the petition); *United States v. Djelevic,* 161 F.3d 104, 107 (2d Cir. 1998) (although "dress[ed] up" as a Sixth Amendment claim, defendant really is challenging the correctness of his sentence under the guidelines and, therefore, is barred by the plain language of his plea agreement; to allow his claim would be to "render[ ] meaningless" such plea agreement waivers).

In this regard, the unpublished decision in *Pardi v. United States*, 100 F.3d 944 (table), 1996 WL 75780, Case No. 95-2553) (2d Cir. Feb. 20, 1996) is persuasive.  In *Pardi*, the defendant was barred by a sentence appeal waiver from collaterally challenging his sentence on the ground of ineffective assistance of counsel.  The defendant had pled guilty to conspiracy to make false statements and committing substantive offenses with respect to certifying false inspection and laboratory results regarding the inspections of certain schools.  His plea agreement contained a stipulated base offense level under the sentencing guidelines, with a 14-level enhancement based on the $7 million estimated

cost of inspecting schools that the defendant had left uninspected.  The agreement provided that neither party would seek a departure or appeal a sentence that fell within the sentencing range specified in the agreement.  The defendant filed a motion to vacate his sentence pursuant to § 2255 on the ground that he received ineffective assistance of counsel because his attorney had agreed to an arbitrary and inflated damage amount, and failed to move for a downward departure.  The district court denied the motion to vacate, and the Second Circuit affirmed, holding that the defendant had voluntarily waived his right to appeal a sentence falling within the stipulated guideline range, and he was not permitted to "enervate this provision by mounting his challenge under § 2255."

The court reached a similar result in *Melicharek v. United States*, 2010 WL 1948492, Case No. 09 Civ. 8542(SAS) (S.D.N.Y. May 13, 2010).  There, the defendant's motion to vacate his sentence pursuant to § 2255 was denied as barred by the appellate/collateral attack waiver contained in his plea agreement, despite claims that his trial counsel rendered ineffective assistance of counsel at the plea negotiation, plea allocution and sentencing phases of his criminal proceeding.  The defendant pled guilty to conspiracy to commit Hobbs Act extortion, conspiracy to commit Hobbs Act robbery and the use of a firearm in furtherance of a crime of violence.  The plea agreement contained stipulations with respect to sentencing enhancements based on the amount of the loss and his role as a manager/supervisor of a criminal activity involving five or more participants.  The defendant claimed that his trial counsel did not inform him of the consequences of the waiver, and therefore it was entered into without the effective assistance of counsel.  The Court rejected this claim as conclusively refuted by the record, and held that since the waiver was voluntary and he received a sentence that

was within the stipulated guideline range, his claims were barred by the waiver.

Thus, to the extent that Petitioners are challenging the computation of their sentences, their claims are clearly waived.  Petitioners seek to avoid this result by claiming to fit within a narrow exception to the enforcement of such waivers, alleging that the ineffective assistance of counsel in computing their advisory sentencing guidelines resulted in their agreement to specific terms of their plea agreements that they would not have accepted had they been given correct advice.

Specifically, Petitioners allege that their trial counsel was ineffective for 1) failing to review discovery, in particular the billings to and payments by Medicare, which precluded him from learning facts pertinent for plea bargaining purposes and sentence guideline calculations that would have lessened Petitioners' sentences; 2) advising Petitioners to accept various terms of the plea agreements which the government offered them even though these terms were unsupported by the facts and contrary to the law and led to the imposition of sentences that were higher than they should have been; and 3) failing to seek enforcement of a grant of immunity under which Petitioner Christian Angarita provided the government with evidence about crimes other than those for which he was indicted, coupled with counsel's advice that Christian stipulate in his plea agreement to the adverse use of this information, resulting in a higher sentence for Christian than he should have received.

The undersigned acknowledges that there are cases which have permitted defendants to challenge their convictions and sentences based upon ineffective assistance of counsel in connection with plea bargaining.  *See Arnoldini, supra.*  More commonly, the exception has been recognized where the defendant challenges his decision to plead guilty as opposed to going to trial.  For example, in *United States v.*

*Patel*, *supra.*, the Court held that such a waiver did not bar consideration of an ineffective assistance of counsel claim where the defendant contended that he would not have pled guilty but for his counsel's promise that he would receive a sentence of two to three years' imprisonment, but he actually received a sentence of 135 months.

In the case at bar, Petitioners have challenged only their decision to enter into this particular plea agreement, on the grounds that their attorney provided misadvice which caused them to agree to inapplicable sentencing guideline enhancements. The Petitioners do not contend that they would not have pled guilty but for the alleged misadvice by counsel. Moreover, they acknowledged that the recommendations were only advisory, that the court was not bound by those recommendations, and that they would not be permitted to withdraw their pleas based upon their sentence. Under these circumstances, the challenge made by the Petitioners is, in essence, the same as a challenge to their sentences, which is clearly barred by their waivers. As recognized by the Second Circuit in *Pardi v. United States*, *supra.* and the Southern District of New York in *Melicharek v. United States, supra.*, to permit the defendants to challenge their attorney's pre-plea advice concerning guideline computations would enervate their waiver, and deprive the Government of the benefit of its plea bargain. There is no manifest injustice that results from barring a defendant from challenging a sentence that is within the statutory limits, and within the guideline range established by the court at sentencing.

Here, Petitioners admitted their guilt and agreed not to collaterally attack their sentences in exchange for the Government's agreement to, among other things: move for dismissal of Count 3 as to Luis Angarita and Count 4 as to Christian Angarita; recommend a two- or three-level downward adjustment for acceptance of responsibility,

25

depending on the offense level at sentencing; recommend a sentencing at the low end of the applicable guideline range; and consider filing a 5K1.1 or a Rule 35 motion to reduce Petitioners' sentences for substantial assistance (DE ## 7-1, 7-2). Petitioners cannot be permitted to circumvent the unambiguous terms of their plea agreements.

In sum, since there is no claim that counsel's alleged misadvice *caused* Petitioners to plead guilty, and no claim that counsel's misadvice *caused* Petitioners to agree to the waiver of their appellate/collateral attack rights, the waiver is enforceable and this Petition should be denied on that ground.[4]  Assuming, however, that Petitioners' claims fall outside the waiver, the undersigned concludes that they still are not entitled to relief since, as explained in detail below, they cannot establish ineffective assistance of counsel.

### B.    Even Assuming the Waiver was Invalid, Petitioners Did Not Receive Ineffective Assistance of Counsel

#### 1.    Framework for Analysis

In order to prevail on their claims of ineffective assistance of counsel, Petitioners must establish that their representation by trial counsel fell below an objective standard of reasonableness, and, that but for the deficiency in representation, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984); *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc).  The burden of proof for demonstrating ineffective assistance of counsel remains on Petitioners throughout this proceeding.  *Roberts v. Wainwright,* 666 F.2d 517, 519 n. 3 (11th Cir. 1982).  In analyzing ineffective assistance

---

[4]  Stated another way, there is no claim that but for counsel's alleged misadvice, Petitioners would not have pled guilty, and no claim that but for counsel's alleged misadvice Petitioners would not have waived their appellate/collateral attack rights.

claims, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Fugate v. Head*, 261 F.3d 1206, 1216 (11th Cir. 2001). In other words, when reviewing counsel's decisions, "the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Chandler v. United States,* 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc) (quoting *Burger v. Kemp,* 483 U.S. 776 (1987). Furthermore, "[t]he burden of persuasion is on a petitioner to prove, by a preponderance of competent evidence, that counsel's performance was unreasonable." *Chandler v. United States*, citing *Strickland,* 466 U.S. at 688. This burden of persuasion, though not insurmountable, is a heavy one. *See Chandler v. United States*, 218 F.3d at 1314 (citing *Kimmelman v. Morrison,* 477 U.S. 365 (1986)).

It is well-settled that a lawyer has a duty to investigate his client's plausible defenses. *McCoy v. Newsome*, 953 F.2d 1252, 1263 (11th Cir. 1992); *Futch v. Dugger*, 874 F.2d 1483, 1486 (11th Cir. 1989); *Code v. Montgomery*, 799 F.2d 1481, 1483-84 (11th Cir. 1986). The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession, recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler v. United States*, 218 F.3d at 1318 n.2 and surrounding text (11th Cir. 2000). *Accord Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("In assessing the reasonableness of an attorney's investigation, ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). As recognized in *Strickland*, 466 U.S. at 690-91, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the

27

limitations on investigation."

If the record is incomplete or unclear about counsel's actions, then it is presumed that counsel exercised reasonable professional judgment.  *See Chandler v. United States*, 218 F.3d at 1314-15 n. 15.  Thus, the presumption afforded counsel's performance "is not ... that the particular defense lawyer in reality focused on and, then, deliberately decided to do or not to do a specific act."  *Id.*  Rather, the presumption is "that what the particular defense lawyer did at trial ... were acts that some reasonable lawyer might do." *Id .*

Moreover, "[t]he reasonableness of a counsel's performance is an objective inquiry." *Chandler v. United States*, 218 F.3d at 1315.  For Petitioners to show deficient performance, they "must establish that no competent counsel would have taken the action that [their] counsel did take."  *Id.*  To uphold a lawyer's strategy, a court "need not attempt to divine the lawyer's mental processes underlying the strategy." *Id.* at 1315 n.16.  Finally, "[n]o absolute rules dictate what is reasonable performance for lawyers." *Id.* at 1317.

If counsel's performance is objectively unreasonable, the second step in the analysis is to determine whether the defendant suffered prejudice as a result of that deficient performance.  In the context of a sentencing proceeding, prejudice can be established by showing that the error resulted in any increased period of incarceration. *Glover v. United States*, 531 U.S. 198 (2001).  However, to establish prejudice where a defendant challenges the voluntariness of his guilty plea based on a claim that his decision was based on ineffective assistance of counsel, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  *Hill v. Lockhart*, 474 U.S. 52,

28

59 (1985). In determining that this requirement of prejudice was warranted, the Supreme Court emphasized the fundamental interest in the finality of guilty pleas: "Every inroad on the concept of finality undermines confidence in the integrity of our procedures; and, by increasing the volume of judicial work, inevitably delays and impairs the orderly administration of justice." 474 U.S. at 58.

If a defendant cannot establish prejudice, it is not necessary to determine whether counsel's advice was constitutionally deficient. *Hill*, 474 U.S. at 60. Several courts have considered the issue of prejudice in circumstances similar to the case at bar. Specifically, where the court has determined that a defendant's appeal waiver did not bar a challenge to his guilty plea based on ineffective assistance of counsel, it has then proceeded to examine whether the alleged misadvice resulted in prejudice. *See, e.g., Fisher-Larue v. United States,* 269 F.Supp.2d 1020, 1023 (C.D. Ill. 2003), *citing Bridgeman v. United States*, 229 F.3d 589, 591 (7th Cir. 2000); *Walton v. United States*, 184 F.Supp.2d 773, 775 (N.D. Ill. 2002), *citing United States v. Martinez*, 169 F.3d 1049, 1052-53 (7th Cir. 1999).

2.    <u>Petitioners Have Failed to Establish Prejudice</u>

In the case at bar, Petitioners do not claim that but for counsel's alleged ineffective representation they would not have pled guilty. Petitioners only assert that they would have been able to bargain for a lesser sentence if their trial counsel had acted in a manner which Petitioners would have viewed as effective. Thus, they have failed to make the showing of prejudice required by the Supreme Court in *Hill*, and their claim must be denied.

In an attempt to avoid the preclusive effect of *Hill*, *supra.*, Petitioners rely on *Glover, supra.*, to claim that they can satisfy the showing of prejudice by establishing

29

that counsel's misadvice resulted in an increased sentence.  Their reliance on *Glover* is misplaced since the defendant in *Glover* was convicted after a trial, and the claimed ineffective assistance of counsel stemmed from his sentencing proceedings.  In the case at bar, the appeal waiver clearly precludes a challenge to the sentencing proceedings–the only arguably available claim is a challenge to the voluntariness of Petitioners' guilty plea, which is governed by the prejudice standard announced in *Hill*.

In sum, Petitioners do not even allege that but for counsel's errors they would not have pleaded guilty.  Therefore, they cannot seek to withdraw their pleas based upon alleged ineffective assistance of counsel.

As set forth below, however, even assuming that Petitioners could rely on a claim that the misadvice of counsel resulted in a higher sentence to establish prejudice, they are still not entitled to relief since they have failed to establish, on the merits, that counsel's advice was deficient.

3.     <u>Petitioners Have Not Demonstrated That Their Counsel Was</u>
<u>Ineffective During the Preparation Phase of the Case</u>

Petitioners have not demonstrated that their trial counsel provided ineffective assistance based on their allegation that he did not review the discovery.  Petitioners' factual bases, signed by them and adopted by their guilty pleas below, were sworn admissions on the record by Luis Angarita that the intended loss figure from Medical 2000 was $789,657 (Ex. E to DE # 7 at 2), and by Christian Angarita that the combined intended loss figure from Medical 2000 and from Gemini was $1,377,040 (Ex. F to DE # 7 at 3).  Petitioners admitted that these intended loss figures were made up of entirely illegitimate claims (Ex. E to DE # 7 at 2; Ex. F to DE # 7 at 3), and these admissions are binding on them.  *See Medlock*, 12 F.3d 185, 187 (11th Cir. 1994) (there is a strong

presumption that the statements made during a plea colloquy are true); *United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988) (when a defendant makes statements under oath at a plea colloquy, he bears a heavy burden to show his statements were false). Indeed, Petitioners have provided only supposition, not evidence, to support their position.

Petitioners initially allege that by the time that Petitioners had been arraigned, they "had advised their trial counsel they had provided a significant amount of legitimate and *bona fide* medical service to Medical 2000's patients" (original emphasis), "told trial counsel that approximately 50% of Medical 2000's patients had received medical equipment used for conditions that *were not* respiratory related" (original emphasis), and "told trial counsel that Medical 2000 had filled prescriptions that they had *not* obtained through kickbacks or bribes" (original emphasis) (DE # 1 at 6).  Petitioners also allege that they provided trial counsel with documents that substantiated this information, and that trial counsel told Petitioners they should plead guilty and cooperate (DE # 1 at 6).  Petitioners allege that trial counsel should have analyzed Medical 2000's billing and isolated billings/payments for legitimate services from billings/payments for those services that were not legitimate (DE # 1 at 6-7).  However, the initial petition does not contain any evidence supporting Petitioners' position, any affidavits from Petitioners, or any of the documents which Petitioners allege they provided to their counsel to substantiate the information.  Furthermore, Petitioners themselves have not provided an analysis of Medical 2000's billing which isolates billings/payments for legitimate services from billings/payments for those services that were not legitimate.  *See Lovett v. Florida*, 627 F.2d 706, 709-10 (5thCir. 1980) (rejecting claim of ineffective assistance of counsel based on failure to obtain expert witness

regarding handwriting analysis where petitioner failed to establish that the desired expert analysis would be exculpatory); *Hernandez v. Wainwright*, 634 F. Supp. 241, 248 (S.D. Fla. 1986), *aff'd* 813 F.2d 409 (11th Cir. 1987) (same re: fingerprint expert). Moreover, the factual bases which established the elements of the offense and the loss amounts referred only to the submission of "false claims seeking reimbursement for medically unnecessary respiratory equipment, including oxygen concentrators and aerosol medications," and did not refer to or include medical equipment that may have been supplied and billed to Medicare for conditions that were not respiratory related. Thus, although Petitioners claim that counsel was ineffective because he did not require the government to eliminate from its loss calculation the billings for legitimate services that were not tainted by kickbacks, he has failed to provide any basis for the contention that the government's loss figures included such amounts. Therefore, Petitioners have not supplied a factual basis to support their argument.

The only documents attached to the initial Petition are the judgments against Petitioners (DE # 1 at 20-34). The documents attached to Petitioners' reply purport to be emails from Petitioner Christian Angarita to attorney Pearson and replies from attorney Pearson to Petitioner Christian Angarita, dated from October 1, 2007 through October 4, 2007, concerning 1) the address of the patient broker for Medical 2000; 2) the information concerning the DME and administrators that Medical 2000 worked with; 3) a statement by Christian Angarita that the amounts paid to the broker represented half the amount paid for the service by Medicare; and 4) a statement by Christian Angarita which apparently refers to evidence of possible cooperation by Petitioners (DE # 13-1 at 1-5). While one of these emails, dated October 4, 2007, states that the amounts paid to the broker represented half the amount paid for the service by Medicare (DE # 13-1 at 1, 2, 5),

it is not clear how this refutes the amount of the loss attributed to them for purposes of sentencing.  Indeed, it appears that it substantiates the illegitimacy of the claims.  Again, Petitioners have not supplied any analysis of the discovery provided to trial counsel, or provided any other evidence, to support their position.  Thus, Petitioners have provided no affidavits or any of the documents which they allege their trial counsel should have reviewed, and they are not entitled to relief on this ground.[5]  Moreover, they have not claimed that they would not have pled guilty if counsel had prepared more thoroughly, and thus they cannot establish prejudice based upon this contention.

This resolution, of course, does not bar Petitioners from claiming ineffective assistance of counsel concerning sentencing issues, which is discussed below.

> **4.** **Petitioners Have Not Demonstrated That Their Counsel Was Ineffective In Advising Petitioners To Accept The Plea Agreement**

Petitioners contend that their trial counsel was ineffective because he advised them to accept their plea agreements, which were based on an erroneous stipulation of the loss amount, as set forth above, and which contained erroneous sentencing guideline calculations.  Luis had a total offense level of 23 in his PSI, and he contends that his total offense level would have been 6 levels lower if he had received effective assistance of counsel (DE # 1 at 13-14).  Christian had a total offense level of 25 in his PSI, and contends that his total offense level would have been 8 levels lower if he had received effective assistance of counsel (DE # 1 at 14).  The specific errors alleged by Petitioners are (1) trial counsel failed to ensure that the numbers used to calculate the loss amount were accurate, and incorrectly agreed that the "intended loss" rather than

---

[5]  Indeed, the instant Petition violates Rule 2(b)(5) of the Rules Governing § 2255 Motions by not being signed under penalty of perjury.

the "benefit conferred" as a result of the kickback, could be used to calculate an enhancement under U.S.S.G. § 2B4.1, since the "intended loss" only applies if the applicable guideline is §2B1.1; and, since the base offense level for §2B1.1 is two levels lower than the base offense level for §2B4.1, this resulted in an impermissible increase of two levels with respect to each Petitioner; (2) the improper agreement that Petitioners would receive a four-level enhancement as organizers or leaders of criminal activity that involved five or more participants, under U.S.S.G. § 3B1.1, because Petitioners now claim that the beneficiaries should not be counted since although Petitioners recruited the beneficiaries they did not supervise them, and therefore their criminal activity only involved Dr. Westerburger; and, (3) as to Petitioner Christian Angarita, counsel improperly permitted the use of his activities at Gemini to be considered relevant conduct, which resulted in an additional two level increase in his base offense level.

For the reasons set forth in detail below, however, the undersigned concludes that the base offense level was properly set under § 2B4.1, and that the amount of the enhancement was properly calculated, or at least, counsel was not ineffective in failing to challenge that calculation; Petitioners have provided no evidence that an independent review of the Medicare billings would have lowered the intended loss figures, which figures Petitioners admitted in their factual bases; Petitioners have not met the heavy burden of showing that their admission in their factual bases that they supervised the beneficiaries, and thus were organizers of criminal activity involving five or more participants, is incorrect; and, Petitioner Christian Angarita has failed to establish that the Government was foreclosed from using the fraudulent scheme involving Gemini as relevant conduct for determining a sentencing enhancement.

Moreover, based on the analysis below, counsel's performance was not

objectively unreasonable since there is no caselaw which contradicts the provisions of

the plea agreement, counsel was entitled to rely upon the facts to which Petitioners

stipulated, and it is clear from the record[6] that counsel discussed with Petitioners the

decision of whether to plead guilty to the Indictment or to sign the plea agreements as

drafted by the Government, and it was not unreasonable to recommend that Petitioners

accept the plea agreements and take advantage of the government's concessions.

     a.     **The Base Offense Level Was Properly Calculated
Under U.S.S.G § 2B4.1**

Petitioners pleaded guilty to conspiring to defraud the United States and to

commit offenses against the United States, specifically to file false claims with the

Medicare program and to pay kickbacks to a medical doctor, Zabdy Westerburger, in

exchange for fraudulent prescriptions for Medicare beneficiaries, in violation of 18 U.S.C.

§ 371; and to conspiring to defraud the Medicare program, in violation of 18 U.S.C. §

1349.  It is undisputed that the Medicare kickback scheme for which Petitioners were

convicted contemplates sentencing under § 2B4.1 (DE # 1 at 10; DE # 7 at 8).[7]  Moreover,

the Petition alleges that the Government insisted throughout the plea negotiations that

this was the applicable guideline (DE # 1 at 6 n.4).  In their plea agreements and in their

factual bases, Petitioners agreed that the amount of the intended loss would be $789,657

for Luis Angarita and $1,377,040 for Christian Angarita.

The Court has already addressed the claim that counsel was deficient in failing to

challenge the amount of the intended loss by excluding legitimate claims, and the same

---

[6]  DE # 7-4 at 3.

[7]  *See United States v. Valladares*, 544 F.3d 1257, 1265-66 (11th Cir. 2008) (District
Court properly used §2B4.1 to calculate offense level for conspiracy to solicit and
receive kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1).).

analysis applies with respect to the calculations at issue in determining the appropriate sentencing guideline range.

Petitioners' additional argument is that an incorrect financial enhancement was used, and that, even assuming the amount of the loss was the amount stated in the plea agreement, it was improper to use this loss amount in determining the guideline offense level under § 2B4.1 (DE # 1 at 11).  The crux of this argument is that the enhancement permitted under §2B4.1 is based upon the value of the "improper benefit" conferred, as opposed to the amount of the "intended loss;" and, that the amount of the "intended loss" can only be used where the substantive offense guideline is §2B1.1, which carries a base offense level that is two levels less than §2B4.1.

To put this dispute in context, it is necessary to review the specific guidelines at issue.  Section 2B1.1 applies to all offenses involving fraud or deceit, generally.  Thus, it is commonly used in connection with health care fraud offenses which involve false claims.  Subsection (b) of section 2B1.1 provides specific offense characteristics, and includes a table which provides an increase in the offense level based upon the amount of the loss.  Application Note 3.(A) explains that "loss" means the greater of the "actual loss" or "intended loss."  The term "intended loss" is defined in Section 3.(A)(ii) as "the pecuniary harm that was intended to result from the offense."[8]  The Petitioners agree, for purposes of this argument, that the amount of the intended loss stated in the Plea Agreements and Agreed Factual Bases in the case at bar would be used to determine the

---

[8]  The undersigned notes that Application note 3.(F)(v) of the Commentary to §2B1.1 provides that where the scheme involves "goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services."

"intended loss" amount under U.S.S.G. §2B1.1 (DE # 1 at 11).

Petitioners argue, however, that the "intended loss" amount cannot be used in connection with U.S.S.G. §2B4.1, which is the guideline that applies to commercial bribery offenses, and which the parties agreed would apply in the case at bar.  Section 2B4.1 carries a base offense level 8, and has a specific offense characteristic which states that the offense level should be increased in accordance with the table in §2B1.1 based upon the value of "the improper benefit to be conferred."  As pointed out by Petitioners, this guideline does not expressly refer to an "intended loss" amount. However, as explained below, an analysis of the cross-references contained in this guideline leads to the conclusion that "intended loss" and "improper benefit" are calculated in the same way.

Application Note 2 in the Commentary to §2B4.1 defines the "value of the improper benefit to be conferred," as "the value of the action to be taken or effected in return for the bribe," and cites to the Commentary to §2C1.1.  Application Note 3 of the Commentary to §2C1.1 states that loss is to be determined in accordance with Application Note 3 of the Commentary to §2B1.1, which was discussed above. Therefore, following this somewhat circuitous route, the undersigned concludes that the amount of the "intended loss" as determined in §2B1.1 is the same as the amount of the "improper benefit" under §2B4.1.

Thus, the undersigned rejects the argument of the Petitioners that the government failed to establish an "improper benefit" and, that therefore, it was improper to use the loss table contained in §2B1.1 in conjunction with the base offense level provided by §2B4.1, to determine the offense level.

This result makes perfect sense.  Under both §2B1.1 and §2B4.1, a defendant

receives an enhancement based on the harm to the government.  Where a bribe is part of the offense, the offense is more serious, and hence the base offense level is eight, rather than the general fraud scenario where the base offense level is six.

Moreover, Petitioners have also not shown that an independent review of the Medicare billing records would have resulted in an different amount of intended loss, under a "benefit conferred" standard, which would have lowered Petitioners' sentence calculations.  Petitioners incorrectly contend that the "benefit conferred" is limited to amounts actually paid, rather than what was billed (DE # 1 at 10).  However, the applicable guideline expressly states that the "benefit conferred" includes "the benefit received <u>or</u> to be received in return for the payment."  U.S.S.G. § 2C1.1(b)(2) (emphasis added).  Thus, it is not limited to what was actually paid.  Since Petitioners have not provided an independent review of the Medicare billing records, their arguments are based on surmise, and not on facts.  Petitioners guess that Luis' offense level may well have been lowered by two levels once an accurate value for the benefit conferred was determined (DE # 1 at 11).  Viewing the amount of loss table in § 2.B1.1, a reduction in Luis' offense level would have required an intended loss of $400,000 or less, and a reduction in Christian's offense level would have required an intended loss of $1,000,000 or less.  However, in their factual bases, Petitioners admitted that Medical 2000 actually received $574,256 in payments from Medicare from the false claims submitted, (Ex. E at 2, Ex. F at 2 to DE # 7).  Moreover, Christian admitted that Medical 2000 and Gemini together caused Medicare to pay $1,016,989 in false claims (Ex. F. to DE # 7 at 2).  The offense level therefore does not change regardless of whether the amount billed or the amount paid is used.

Petitioners' failure to provide an analysis of the Medicare billing records also

means that they cannot argue that their counsel should have had a figure of 50% of the Medicare billings placed in the plea agreement as the intended loss amount.[9]  Petitioners have not provided any evidence to support their argument.  All they have provided are some cryptic emails attached to their reply.  Specifically, Petitioners' reliance on a October 4, 2007 email from Christian Angarita to trial counsel (DE # 13-1 at 1, 2, 5), is misplaced.  The email states, in part, "Also just to refresh and specify that the amounts paid on the patient broker's list is the amount paid to the broker for the service to the patient which represents half of the amount paid for the service by Medicare.  We did not pay any of her patients and had no control over her kickbacks or any Meds if there was any."  This conclusory statement, with no factual support, is in a series of emails which appear to relate to Petitioners' possible cooperation with the government, and provides limited, if any, factual support for Petitioners' contentions, especially when contrasted with Petitioners' contrary statements, contained in their October 16, 2007 factual bases and which they adopted under oath at the October 16, 2007 plea colloquy, concerning the amounts of intended loss in the Medical 2000 and Gemini schemes.  They have gained the benefit of their bargain and sworn to certain facts.  They have not carried their heavy burden to show that the facts to which they swore, concerning events they knew the most about, were incorrect.

> **b.**    **Petitioners Have Not Shown That a Four-Level Enhancement Was Improper**

Section 3B1.1(a) of the Sentencing Guidelines provides for a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that

---

[9]  Nor have Petitioners even attempted to establish that the government would have agreed to such a figure.

involved five or more participants or was otherwise extensive."  Application Note 3 of the Commentary to this section makes it clear that "in assessing whether an organization is 'otherwise extensive,' thus eliminating the requirement of five or more participants, all persons involved during the course of the entire offense are to be considered."  In addition, Application Note 2 makes it clear that there is a requirement that a "defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."  *See United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004) (enhancement applies to individual who recruited another individual to participate in the crime); *United States v. Harnes*, 180 F.3d 1232, 1235 (11th Cir. 1999) (defendant's control of the victim agency's property and assets was insufficient to support enhancement where he did not exercise control over any other participant); *United States v. Quigley*, 373 F.3d 133, 138-39 (D.C. Cir. 2004) (defendant did not qualify for any role enhancement where district court found that she did not "manage or supervise" anyone in the conspiracy, although the conspiracy involved five or more participants or was otherwise extensive).

In the case at bar, it is clear that the criminal activity involved five or more participants, since the two defendants, the patient broker, Dr. Westerburger, and pharmacists were involved, as well as the 35 beneficiaries; and, even if there were not five or more participants, the organization was "otherwise extensive."  Petitioners do not appear to dispute the fact that the criminal activity involved five or more participants or was otherwise extensive, but contend in their reply that there is no evidence that Petitioners recruited more than the one doctor (DE # 13). Thus, they dispute that they recruited the beneficiaries, and contend that absent recruitment of the beneficiaries they are not eligible for the role enhancement.

At the outset, the undersigned rejects Petitioners' argument that they must have supervised at least five other persons in order to qualify as an organizer or leader.  On the contrary, it is only necessary for them to have supervised, or recruited, one other participant in order to satisfy this prong of the guideline.  As explained by the Court in *United States v. Yeager*, 331 F.3d 1216, 1226-27 (11th Cir. 2003):

> Under the Guidelines, a four-level increase in the applicable offense level is appropriate if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). If the defendant was a "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive," then the offense level should be increased by three. Id. at (b). When the defendant is "an organizer, leader, manager, or supervisor" in any other criminal activity (that is, any criminal activity not involving five or more participants and not extensive), then his offense level should be increased by two. Id. at (c). The district court imposed the two-level § 3B1.1(c) enhancement on Yeager.
>
> According to the commentary, "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 comment. (n. 2). Yeager latches onto this commentary as support for his argument that, in a conspiracy of two people, only one can be sentenced for a leadership role. However, we do not think this argument flows from the commentary. When a conspiracy involves only two participants, each participant can be a "organizer, leader, manager, or supervisor" in the criminal conduct when each participant takes primary responsibility for a distinct component of the plan and exercises control or influence over the other participant with respect to that distinct component of the plan. The record is replete with instances from which the district court could have concluded that Yeager directed or organized or led Powell in the conduct of certain elements of the criminal scheme. Even more telling, the record indicates that Yeager directed other employees of Druggist and Distributors to undertake tasks designed to further the scheme.

*Accord United States v. Chavez*, 549 F.3d 119 (2nd Cir. 2008); United *States v. Barnes*, 993

F.2d 680 (9th Cir. 1993); *United States v. Rivero*, 993 F.2d 620 (7th Cir. 1993).  Thus, the contention that Petitioners were required to supervise five other persons in order to qualify for the role enhancement is without merit.  Petitioners were only required to supervise one other person, provided that there were a total of five other <u>participants</u> in the crime <u>or</u> the criminal activity was otherwise extensive.

Moreover, in their factual bases, each Petitioner admitted that he was a leader/organizer of the Medical 2000 scheme, that involved five or more participants and was otherwise extensive, because he recruited (35) beneficiaries, and a doctor; and, accordingly, that he should receive a four point role enhancement pursuant to U.S.S.G. § 3B1.1(a).  Each Petitioner also provided details of the scheme and of their individual roles in the scheme.  During the plea colloquy, Petitioners also stated that they had each had an opportunity to review the agreed factual basis for the plea and to discuss it with counsel, and that they each agreed with their factual basis.  Petitioners' counsel now claims, without providing any affidavits or evidence aside from some cryptic emails, that Petitioners only recruited Dr. Westerburger, and that they had told their trial counsel that they did not recruit or pay the beneficiaries, and that they paid a patient broker for the Medicare beneficiaries names and numbers (DE # 13 at 6-7).

The representations of Petitioners in their factual bases, which they adopted at the plea colloquy, combined with the findings made by the judge accepting the plea, constitute "a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison,* 431 U.S. 63, 74 (1977).  Petitioners' declarations in open court carry a strong presumption of truthfulness which is not overcome by the subsequent presentation of conclusory and contradictory allegations.  *Id.*  The statements of a defendant made under oath in open court are presumed to be true.  *United States v. Medlock,* 12 F.3d 185,

187 (11th Cir. 1994); *United States v. Gonzalez-Mercado,* 808 F.2d 796, 800 n. 8 (11th Cir. 1987).  Because a defendant's statements concerning plea consequences at the time of plea are considered "persuasive evidence," they are not overcome by the defendant's bald assertion of misunderstanding.  *Harvey v. United States,* 850 F.2d 388, 396 (8th Cir. 1988).  Thus, "if the Rule 11 plea taking procedure is careful and detailed, the defendant will not later be heard to contend that he swore falsely." *United States v. Stitzer,* 785 F.2d 1506, 1514 n. 4 (11th Cir. 1986).

Petitioners stated in their factual bases, which they adopted in their plea colloquy, that they should each receive a four point role enhancement as leaders/organizers of the extensive Medical 2000 scheme, which included recruiting 35 beneficiaries and a doctor. Petitioners have not now met their heavy burden of overcoming the strong presumption of truthfulness which attaches to these statements.

As previously stated, Petitioners' reliance on a October 4, 2007 email from Christian Angarita to trial counsel (DE # 13-1 at 1, 2, 5), is misplaced.  The email states, in part, "Also just to refresh and specify that the amounts paid on the patient broker's list is the amount paid to the broker for the service to the patient which represents Half of the amount paid for the service by Medicare.  We did not pay any of her patient and had no control over her kickbacks or any Meds if there was any."  This conclusory statement, with no factual support, is in a series of emails which appear to relate to Petitioners' possible cooperation with the government, and provides limited, if any, factual support for Petitioners' contentions, especially when contrasted with Petitioners' contrary, detailed statements concerning their role in the Medical 2000 scheme contained in their October 16, 2007 factual bases and adopted under oath at the October 16, 2007 plea colloquy.

Thus, there is no evidence that either Petitioners' trial counsel provided substandard performance in negotiating this portion of the plea agreement, or that Petitioners were prejudiced by admitting that they were organizers of the Medical 2000 scheme. *See United States v. Rogers*, 848 F.2d at 168 (appellate court affirmed the district court's refusal to allow the defendant to withdraw his guilty plea to engaging in a continuing criminal enterprise where the defendant alleged after his plea that he had not supervised five or more people, because the defendant admitted his factual guilt under oath at his guilty plea hearing and his post-plea recantation fell far short of the heavy burden to show his statement at the plea was false.); *accord United States v. Perez*, 285 Fed. Appx. 706, 709 (11th Cir. 2008) (appellate court affirmed the sentencing court's application of an offense level enhancement for being a leader or organizer of an organization based on the defendant's admission in her factual basis that she had provided the doctors and Medicare beneficiaries willing to participate in the conspiracy to commit health care fraud).

  c. **Christian Angarita Has Not Demonstrated That His Counsel Was Ineffective In Advising Him To Accept The Plea Agreement Which Included His Conduct at Gemini**

Christian Angarita has not demonstrated that his counsel was ineffective in advising him to accept the plea agreement which included his conduct from August 1999 through November 2000 at Gemini. Christian's involvement with Gemini qualified as relevant conduct. The use of Christian's involvement with Gemini did not violate the September 21, 2007 immunity letter. In any event, Christian waved any immunity he might have had by agreeing to plead guilty and by including the facts concerning Gemini in his factual basis.

44

Initially, Christian's involvement with Gemini qualified as relevant conduct, pursuant to §1B1.3(2) of the Guidelines.  To establish relevant conduct, the sentencing court must evaluate the similarity, regularity and temporal proximity between the conviction and the uncharged conduct and "must consider whether there are distinctive similarities between the offense of conviction and the remote conduct that signal that they are part of a single course of conduct rather than isolated, unrelated events that happen only to be similar in kind."  *United States v. Maxwell*, 34 F.3d 1006, 1011 (11th Cir. 1994).  As Christian admitted in his factual basis (Ex. F to DE # 7 at 2), Gemini operated in exactly the same manner as Medical 2000; Christian was involved with Gemini from August 1999 through November 2000, immediately before Medical 2000 began operating in December 2000; Gemini was integral to Christian's ability to establish the relationships with Medicare beneficiaries necessary to submit false claims at Medical 2000; and it was through Gemini that Christian first entered into an arrangement with Dr. Westerburger.  This was the same course of conduct with the same modus operandi and many of the same participants to which Christian admitted in his guilty plea, so it was appropriate to be included as relevant conduct.  *See* U.S.S.G. §1B1.3, Comment 9(B) (defining relevant conduct as part of a common scheme or plan as the offense of conviction, being substantially connected to each other by at least one common factor, such as common victims or similar modus operandi).  *See also United States v. Buchanon*, 299 Fed. Appx. 903, 904 (11th Cir. 2008) (appellate court affirmed trial court's finding that September 2007 possession of cocaine with intent to distribute qualified as relevant conduct to conviction for May 2007 possession of cocaine with intent to distribute because the offenses were similar, each involving cocaine base, an intent to distribute, a lack of drug paraphernalia, and concealment of the cocaine in vehicles);

*United States v. Villanueva-Naranjo*, 276 Fed. Appx. 955, 960-61 (11th Cir. 2008) (appellate court affirmed trial court's finding that April 2006 seizure of six pounds of methamphetamine, 413 grams of marijuana, 30 grams of cocaine and three handguns with ammunition from stash house rented by the defendant qualified as relevant conduct to conviction for conspiracy to possess at least five kilograms of cocaine with intent to distribute from February 2006 through April 2006 using a separate stash house because the offenses were similar in time, and the evidence indicated similarity between the uncharged conduct and the indicted offense, each involving delivering drugs using vehicles with hidden compartments); *United States v. Jones*, 199 Fed. Appx. 812, 814-16 (11th Cir. 2006) (appellate court affirmed trial court's finding that the defendant's scheme to create and pass fraudulent certified checks to unsuspecting victims to purchase cars and watches, which he operated in Virginia from May 1998 through April 2001, qualified as relevant conduct to conviction for bank fraud in Georgia running from October 2003 to September 2004 involving "kiting" fraudulent certified checks, because the uncharged conduct was sufficiently similar in modus operandi to the charged offense, and the uncharged conduct was also committed with sufficient regularity and in temporal proximity to the charged offense).[10]

Christian misplaces his reliance on *United States v. Gomez*, 164 F.3d 1354, 1357 (11th Cir. 1999), for the proposition that Gemini was a separate offense with identifiable beginning and end points, not qualifying as relevant conduct (DE # 13 at 9). In *Gomez*, the defendant was convicted on one count of conspiracy to possess with intent to

---

[10]   While the Gemini conduct occurred outside the statute of limitations, a sentencing court may rely on conduct committed outside the statute of limitations as "relevant conduct".   *See United States v. Silkowski*, 32 F.3d 682, 688 (2nd Cir. 1994).

distribute heroin, cocaine and crack cocaine, operating out of the Sparkling City Car

Wash in Savannah, Georgia. *Id.* at 1355. The evidence showed that the defendant

supplied a total of one and one-quarter kilograms of powdered cocaine to individuals at

the car wash over a two year period, in at least quarter kilogram amounts, and that the

individuals then sold the cocaine out of the car wash. *Id.* at 1355, 1357. The Eleventh

Circuit held that the defendant's sale of two kilograms of cocaine to one Danny Saldana,

a person who was not connected to the Sparkling City Car Wash operation, done at

about the same time as the defendant began to supply the car wash operation with

cocaine, was not part of the same course of conduct as the conspiracy, and could not be

used as relevant conduct at sentencing, because Saldana was not connected to the car

wash operation, and the sale to Saldana was conceptually different than the car wash

conspiracy. *Id.* at 1356-57.

       In the instant case, Gemini operated the same way as Medical 2000, ended

immediately before Medical 2000 started, and Medical 2000 and Gemini both used Dr.

Westerburger to sign fraudulent prescriptions for Medicare, in return for kickbacks.

Thus, Gemini was in temporal proximity to Medical 2000 and operated using the same

modus operandi.

       Furthermore, contrary to Christian's assertion, the September 21, 2007 letter did

not bar the government from including information about Gemini as relevant conduct.

Paragraph 3 of the letter states:

> Should any prosecution be brought against Mr. [Christian]
> Angarita by the United States, the United States will not offer
> into evidence in its case-in-chief any statements made by
> [Christian] pursuant to the proffer agreement, except in a
> prosecution for false statements, perjury or obstruction of
> justice arising out of his proffer. Nevertheless, the United
> States can use in any way information derived directly or

> indirectly from statements made by Mr. [Christian] Angarita
> under this proffer agreement for the purpose of obtaining
> leads to other evidence, which evidence may be used by the
> United States in any prosecution of him.  Moreover, the
> United States may use statements made by Mr. [Christian]
> Angarita under this proffer agreement for the purpose of
> cross-examination of him and as impeachment evidence in
> any criminal proceeding, or to rebut any evidence offered by
> or on behalf of Mr. [Christian] Angarita in connection with
> any trial and/or sentencing, should any prosecution be
> undertaken.

(Ex. G to DE # 7 at 1-2).  The letter states that the only thing the United States is restricted from doing with the information provided by Christian pursuant to the letter was offering any such statements in its case-in-chief.  Even this restriction was subject to the limitation of a prosecution for false statements, perjury or obstruction of justice rising out of the proffer.  As the United States only used the Gemini conduct proffered by Christian as relevant conduct for Christian's sentencing, and not as evidence in the government's case-in-chief in a prosecution of Christian, the use of the information at issue did not violate the proffer agreement.[11]

Section 1B1.8(a) of the Sentencing Guidelines, upon which Petitioner relies, does not alter this result.  That section provides:

> Where a defendant agrees to cooperate with the government
> by providing information concerning unlawful activities of

---

[11]  In view of this conclusion, it is not necessary to reach the government's argument that the information concerning Gemini was readily obtainable by the government through other means, including a basic review of Medicare data for Gemini and Dr. Westerburger, and through publically available State of Florida corporate documents which listed Christian Angarita as the registered agent and owner of Gemini during the relevant time period (DE # 7 at 12).  The undersigned notes, however, that the PSI refers to the prosecution of Dr. Westerburger as a related case, noting that she had pled guilty on April 12, 2006 (PSI at ¶ 7).  The records of this Court reflect that Dr. Westerburger's plea agreement contains a cooperation agreement, and the Government filed a motion for downward departure based on her cooperation (Case No. 06-60070-CR-COHN: DE ## 13, 39).

others, and as part of that cooperation agreement the
government agrees that self-incriminating information
provided pursuant to that agreement will not be used against
the defendant, then such information shall not be used in
determining the applicable guideline range, except to the
extent provided in the agreement.

This guideline, therefore, restricts the use of information only to the same extent as the

immunity letter.  Since the immunity letter was limited to precluding the use of the

information in the government's case-in-chief, it was permissible for the government to

use this information in determining the applicable offense level.

This construction of the immunity letter is buttressed by the fact that the

subsequent Plea Agreement and Agreed Factual Basis expressly includes this

information as relevant conduct.  Moreover, even if the immunity letter could be read as

precluding the use at sentencing of the information regarding Gemini, the subsequently

executed Plea Agreement and Agreed Factual Basis superseded this immunity.  It was

reasonable for counsel to advise acceptance of this provision since it enabled Petitioner

Angarita to receive the benefit of the plea bargain, in exchange for which the government

was not obligated to track down other leads to establish those facts at sentencing.

Therefore, Petitioner Christian Angarita has not shown that his trial counsel

performed unreasonably on this issue, or that he was suffered any prejudice by his

attorney's actions.

C.      No Evidentiary Hearing on the Motion Is Necessary

Petitioners do not request an evidentiary hearing.  In any event, no evidentiary

hearing should be held because the record of this case conclusively shows that

Petitioners are not entitled to relief, and because the allegations in the petition are

conclusory.  *See Lynn v. United States*, 365 F.3d 1225, 1238-39 (11th Cir. 2004)*; Smith v.*

49

*Singletary*, 170 F.3d 1051, 1053-54 (11th Cir. 1991).

IV.   <u>CONCLUSION</u>

In sum, the undersigned concludes that Petitioners are not entitled to relief for the following reasons:

1.  Their waiver of the right to collaterally attack their convictions and sentences was knowing and voluntary.

2.  Their claims of ineffective assistance of counsel are barred by this waiver since the alleged ineffectiveness did not affect the decision to plead guilty or to waive their right to collateral review.

3.  Even if Petitioners were permitted to lodge their claims of ineffective assistance of counsel, they are not entitled to relief because they have failed to show that but for the claimed deficiency of counsel they would not have pled guilty.

4.  Petitioners have also failed to establish, on the merits, that counsel's performance was objectively unreasonable since the advice he gave, based upon their factual admissions, was legally correct.

Therefore, for the reasons stated above, it is hereby

**RECOMMENDED** that Christian Angarita's and Luis Angarita's Petition For Writ of Habeas Corpus Pursuant to Title 28 U.S.C. § 2255 (DE # 1), be **DENIED**.

The parties will have fourteen days from the date of service of this Order within which to file written objections, if any, for consideration by the Honorable Ursula Ungaro, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149

(11th Cir. 1993).

        **DONE AND SUBMITTED** in chambers in Miami, Florida, on May 24, 2010.


                *Andrea M. Simonton*
                ANDREA M. SIMONTON
                UNITED STATES MAGISTRATE JUDGE

Copies via CM/ECF to:
The Honorable Ursula Ungaro,
   United States District Judge
All counsel of record